# H. C. Bughman, Plff. in Err., v. John M. Byers.

The supreme court will reverse where statements of fact are made in
the charge of the lower court which are in conflict with the evidence.

. The supreme court will consider the charge only as it appears in the rec-
ord, notwithstanding the trial judge has certified that it is inadequate and
incorrect, owing to the inability of the stenographer to follow the explana-
tions of the court made in connection with a map used at the trial.

(Argued November 3, 1887.  Decided January 3, 1888.)

October Term, 1887, No. 183, W. D., before GORDON, Ch. J.,
PAXSON, STERRETT, and WILLIAMS, JJ.   Error to the Com-
mon Pleas No. 2 of Allegheny County to review a judgment in
favor of the defendant in an action of ejectment.  Reversed.

This action was brought by H. C. Bughman, surviving trus-
tee under the will of James H. Hays, deceased, against John M.
Byers.

The facts appear in the following portions of the charge of
the court by EWING, P. J.:

The representative of the estate of James H. Hays, who died
in March, 1876, brings an action of ejectment against John M.
Byers, to recover a tract of land of irregular shape, containing
a little less than an acre, situated in Mifflin township, a short
distance from the Pittsburgh, Virginia, & Charleston Railroad,
and near the Monongahela river.  .  .  .

The case involves the location of an original patent line, a
grant from the commonwealth.   In 1769 a warrant was grant-
ed to Catherine Thompson for a tract of land in which was then

Peter's township, Washington county, antedating nearly twenty years the formation of this county, and a survey made on the 26th of November, 1769, and a patent issued on the 2d of January, 1788, for a tract called "Liberty" or "Liberty farm." On the 19th of November, 1791, a warrant was granted to the same Catherine Thompson for a survey of land adjoining this, and which was known as the "L" warrant from its peculiar shape. The "Liberty farm" is this large tract marked on the map of Mr. McRoberts, and the "L" warrant land along the upper edge of this—the larger portion of it, and then the narrow and irregular portion between here. (Indicating on map.) Catherine Thompson afterwards sold one part of this, the "Liberty farm," to one party, and the "L" warrant tract to another.

At an early day James H. Hays became the owner of the "Liberty farm," and Mr. Kinney, the elder, of the "L" warrant farm, which he owned in connection with other land. Now, in a dispute over these matters, the right is in the older warrant and older patent. If they conflict—if there is actual interference—the older in time is the stronger in right. Mr. Kinney, in 1873, sold a small portion of this (two or three acres) to Mr. Byers, the present owner, and Mr. Byers now stands in the shoes of Mr. Kinney.

(Pointing to a map of Mr. McRoberts placed in view of the jury.) The plaintiff claims that this little strip running down the long line, and this, which includes the house, I believe about 122 feet in width, and along this line, is over upon their ground. The Liberty farm in its general outline ran down here (indicating on map), and then ran along the narrow strip fronting on the river, down to the river, below the main body of it. It is a singular shape, and why that was run along the Liberty farm, I do not know, because at that early day river front was not usually considered as of much account. But he has some 50 rods more front on the river than the body of the land would give it. Now, the dispute as to the actual line occurs on this long line, and then as to the location of this line (indicating on map), the plaintiff wanting to make it farther from the river than the defendant wants it. The dispute on this line (long line) is very slight; on this one running parallel with the river it is considerable.

The defendant sets up two defenses: first, that it is not within the limits of the Liberty warrant, but is within the limits of

the "L" warrant, and that the plaintiff, and those claiming through him, never had any title to it, which, of course, is a good defense; and the defendant being in possession, the burden is upon the plaintiff to satisfy you that it is within the original line and marks of the Liberty survey. They must establish that affirmatively. Then the defendant says in addition, that even if it was, if there is a mistake about that, nevertheless he and Mr. Kinney together have held it in possession for over twenty-one years, held it openly, notoriously, exclusively, and hostilely against everybody, and that that gives him the title; and if that be the fact, it does, even though they were mistaken about its being in the "L" warrant originally; even though it was in the Liberty patent. . . .

· The surveyors in this case, I think, very properly indicated that they gave only their best judgment as to where this line actually is. They were not positive. [In my judgment there is no man who can undertake to say absolutely where it is. They give the probabilities and give their reasons for it. There is not any mark on the ground, that is, no corner, that is shown to be clearly a mark of the original survey. There is some of the evidence which shows a very strong probability of one at least being an original mark; and yet there is evidence that would negative that, or evidence tending to show it was a mistake.] [1]

You will bear in mind that marks on the ground that are unequivocal will always control courses and distances in a survey. The lines are where they are located on the ground, even though the surveyor should make a mistake, as he often does, and did in those times, in both the courses and distances; and if two corners were fixed and a straight line between them, although the course might vary twenty or fifty degrees from the course given by the surveyor in his plan, and the distance might differ a half, still those two corners would control absolutely.

[In old surveys, made at the time these were made, it is a rare thing where there is an accurate distance given. As a general rule, the distances measured out more than the old surveys gave. Sometimes, though, they fell considerably short. It was the custom then, when they did measure at all and not guess at it, when it was rough ground, to measure on the surface, and then make a liberal estimate for the amount to be added to make the level distance.] [2]; and on rough ground there is more

likelihood to be a discrepancy than on smooth, and on level ground much less likely to be an error than where it is steep. The courses and distances on the "L" warrant are, many of them, evidently erroneous; and if this survey be correct, they are also erroneous on the Liberty tract. To start with this line (indicating) there is the hickory at this point; that is admitted to be common to the "L" warrant and to the Liberty patent. This line, upper line, across here is also on the line as I understand the warrant. The "L" warrant ran along there. They both called for 144 perches on this line. Now the Liberty patent calls for 197 perches on this line from hickory towards river, and the "L" warrant for 179. I would guess that that was a mistake in the scrivener writing 179 for 197, or *vice versa.* I suspect that the learned counsel for the plaintiff is correct in saying that many of the lines on the "L" warrant were not measured at all; that it was taken with other surveys, which was a very common thing in those days. [Mr. McRoberts, and those who agree with him, are of the opinion they have found the true line by measuring from the hickory that they claim is evidently a corner. Yet there is no mark here.] [3]

[All the old deeds call for the hickory, and some lines run in there, and the probabilities are exceedingly strong that that hickory is the original line or one very close to it. It was a common thing with old surveyors to mark side trees on the line; and they were not very particular as to whether they were on the line or off it, but as a general rule they will give the general course of the line. They were not usually very far off the straight line, although on rough ground they were sometimes found several rods off.] [4] [The plaintiff's surveyors run out the distance called for in the original patent, stopping at 197 rods at, they say, a white oak stump. Now there is no evidence that that is the stump of the original white oak, further than that they stop at 197 rods, and there they find a white oak stump.] [5] They say, however, in addition, that it is the general line of those trees and the mark on the next line that they run across, called for in the original patent, with variation, I believe, in the distance, of 55 rods; and they say they found in that line a marked beech, and that they "blocked" it, and that it is very old. . . .

They ran out that line then. The theory on which the surveyors for the plaintiff stopped at that distance on this line was

the distance was accurately given in the original patent and warrant, and the distance on this line (*i. e.,* the line parallel with the river—indicating) was accurately mentioned on the warrant. Then, when they came to the lower line of the patent they ran the course to the river, and Mr. McRoberts says that instead of being 15 rods, it would be 50 feet longer. This is running out the line they ran which ought to be 15 rods from the bank of the river, by the patent line is 18 rods as the bank now stands. The testimony I think, uncontradicted, is that there is a fence on this line from the river up through the river bottom land, after it reaches the hill. It is bluff, I understand, some distance up; and they claim that this is the proper location of their line. They give you that evidence and give the probabilities. On the other hand, Mr. McCully makes a measurement and he makes it fall a little further up on the Liberty farm than they would, and he measured down on this distance 207 rods, and having found an angle he ran the 207 rods on this ground (indicating). He says that down some twenty-five rods he found a beech tree marked, an old mark, which he took for a line and took that and ran the courses called for in the original papers until it would intersect. He ran the course called for in the papers at any rate without less variation. From that beech tree the intersection of this long line called for in the original papers cut it 207 rods from the hickory. But his course is changed some little. Now, to show that that distance is not a very safe criterion to stop at, Mr. McRoberts tells us that he made a survey of the Liberty farm when he made this plot. He began at the railroad and ran back and gives us the distance. He found this line at the upper line of the Liberty patent, the furthest away from the "L" warrant, to his satisfaction, although he did not find any original corner, and he runs across this long line that is common to the "L" warrant and the Liberty patent, and he makes it on his measurement 2,821 feet, which would be 171 perches, lacking half a foot, and yet his original patent and both patents only call for 144 perches, so on that line on which he has satisfactory evidences of the corner there is the difference between 144 and 171 perches. Then on this other line he makes a difference of 3 rods. This short line is 3 rods different from what the patent calls for, and if you believe the uncontradicted evidence, there is a considerable amount that has gone into the river from the time this original survey

was made, so that to make the corner that the plaintiff makes in connection with the other things, they shorten this line from the river up 3 rods as the river bank now stands, and if you believe the testimony considerably more than that, and with this line lengthened from 144 to 171 perches, they stop short at the distance called for in the original survey on those two disputed lines.

[Now it may be that that white oak stump that they fixed as the corner is the stump of the original tree called for in the patent line, but it is a marvel in surveying if they found right at the end of the distance called for in that original survey the stump of the identical tree. It would occur very rarely, and yet it is some indication and very likely it may be very near the line.] [6] So it seems to me that the surveyors are properly cautious when they avoid expressing an absolute opinion as to just where the corner is.

The verdict and judgment was for the defendant.

The assignments of error specified: (1–6) The portions of the charge included within brackets and indicated by exponents.

*Thomas C. Lazear* and *J. McF. Carpenter,* for plaintiff in error.—That the charge of the court had a tendency to mislead the jury, and that it was as a whole prejudicial to plaintiff's cause, is, we think, very apparent. The court should have been content with a full and dispassionate submission of the facts to the jury. It has been frequently held that the court is responsible for the general effect of its charge. Pennsylvania Canal Co. v. Harris, 101 Pa. 92; Garrett v. Gonter, 42 Pa. 143, 82 Am. Dec. 498; Relf v. Rapp, 3 Watts & S. 21, 37 Am. Dec. 528.

If no particular instructions be asked, the court is responsible for the general effect only of the charge; and in considering the charge the whole of it must be taken together. If when so considered it has a tendency to mislead, although no particular portion of it be clearly erroneous, it is cause for reversal. Washington Mut. F. Ins. Co. v. Rosenberger, 3 W. N. C. 16.

Not only did the charge have a tendency to mislead, but through some misapprehension on the part of the court, statements of fact in direct conflict with the testimony were made and dwelt upon at some length.

*John Dalzell,* for defendant in error.—In charging the jury, the court below made use of maps; and the charge is largely unintelligible, unless when read in connection therewith.

Suppose the judge below did mistake the evidence (as he did not) that is not assignable for error. The remedy is by motion for a new trial. Dennis v. Alexander, 3 Pa. St. 50.

Such motion was made by counsel in the court below and overruled.

But the court made no mistake in its charge as to matters of fact. Every excerpt carved out of the charge and assigned for error can be justified, when read in connection with the context, and when the charge is read as a whole.

OPINION BY MR. JUSTICE STERRETT:

An examination of this record has led us to the conclusion that some of the learned judge's comments on portions of plaintiff's testimony were calculated to unduly weaken its effect and thus mislead the jury. After saying: "Mr. McRoberts and those who agree with him are of opinion they have found the true line by measuring from the hickory that they claim is evidently a corner," he added: "Yet there is no mark there." This latter statement appears to be in conflict with the evidence.

Three of plaintiff's witnesses, all of whom are experienced surveyors, testified as to the exact location of the hickory tree corner; and one of defendant's witnesses, Mr. McCully, said he believed "the hickory stump to be the true corner at that point; have always believed that; have been over this locality half a dozen times. I have run different marked lines in to that point."

Another witness said in substance, there was no dispute as to the line from the hickory. If the testimony tended to prove anything, it was the location of the hickory corner designated by the stump of what appears to be the original hickory, and the fact that the line fence between the Liberty farm and the "L"ʌ warrant, as it is called, begins at that stump. We think, therefore, that the remark complained of was incorrect and misleading.

Plaintiff also introduced evidence for the purpose of fixing the location of corner at the Byers lot, and some of his witnesses testified to having found a white oak stump at a point corresponding both in course and distance to the position of the white

oak called for in the patent, and gave it as their opinion that it was the stump of that tree, etc. Referring to the testimony of those witnesses the learned judge remarked: "It would be a marvel in surveying if they found right at the end of the distance called for in the original survey the stump of the identical tree," etc. In addition, to its inaccuracy as a general proposition, this assertion was calculated to unduly weaken the effect of plaintiff's evidence on that subject. Other remarks, complained of in the first and second specifications, had a similar tendency.

In his certificate the learned judge says: "The foregoing is a very inadequate and, in some respects, an incorrect report of the charge of the court. The stenographer, without any knowledge of the testimony, or maps or papers, was called in to take down the charge. A considerable portion of the explanations and instructions to the jury were given with reference to a map in evidence which was before the jury and referred to by the court during the charge."

We have no doubt as to the correctness of this criticism. If we had been furnished with an accurate report of the charge as delivered to the jury, it would probably appear that the instructions, as a whole, were entirely free from error; but we must take the record as we find it, and upon that we are of opinion that the plaintiff has just reason to complain of the manner in which this case was submitted to the jury.

Judgment reversed and a *venire facias de novo* awarded.